IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY P. CORNIELS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 11 C 4267 |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Larry Corniels brought this action for review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381a. For the following reasons, Corniels's motion for summary judgment (dkt. 13) is granted and the case is remanded to the Commissioner for further proceedings consistent with this order.

## BACKGROUND

### I. Medical History

Corniels is now 64 years old and lives in Tinley Park, Illinois with his landlord. (Administrative Record[2] ("AR") 45-47.) He is unmarried and has one daughter from a previous marriage with whom he has little contact. (AR 97-98, 640.) He suffers from panic disorder,

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin automatically substituted for the former Commissioner, Michael J. Astrue, when she became the Acting Commissioner of Social Security on February 14, 2013. Fed. R. Civ. P. 25(d).

[2] Five pages of the record reference a different claimant (*see* AR 332-37) but the record otherwise appears complete.

agoraphobia, depression, and anxiety disorder. (AR 52.) He was first treated for his psychiatric conditions in 1974 and has been on psychotropic medication since 1975. (AR 49, 54, 89-90.) At the time of the hearing before Administrative Law Judge Marlene Abrams ("the ALJ"), Corniels was taking generic Prozac, Buspar, and Klonopin, as well as medication to treat his high blood pressure. (AR 88-90.)

The earliest available medical records are from one of Corniels's treating psychiatrists, Dr. Kirts, who provided his notes and a brief opinion for Corniels's 2004 application for disability benefits. (AR 346-355.) Dr. Kirts stated that Corniels suffers from panic disorder with depressive features and that he is "unable to remember instruction or respond to supervisors due to panic attack." (AR 350.)

From 2006 to 2008, Corniels saw Dr. Vora, a psychiatrist at Grand Prairie Services.[3] (AR 399-409, 565-606, 610-28.) Dr. Vora diagnosed Corniels with panic disorder, agoraphobia, and depression. (AR 403.) She noted that Corniels was generally cooperative and interacted appropriately, and gave him a Global Assessment of Functioning[4] ("GAF") score of 70. (AR 399, 403.) Dr. Vora prescribed Prozac and Clonazepam. (AR 403, 565.) Her notes indicate that Corniels was stable and that his anxiety and depression were under control with the exception of occasional mild panic attacks. (*See* AR 634.) Corniels's GAF score stayed consistent at 70. (*Id.*)

From April 2009 until July 2009, Corniels was treated by Dr. Chung, another psychiatrist at Grand Prairie Service. (AR 56-57, 60, 657-61.) Dr. Chung's notes generally confirm Dr. Vora's observations. (AR 658-61.) Dr. Chung did note increased anxiety due to Corniels's then-

---

[3] Corniels also saw a Dr. Boyle at Grand Prairie Services, but it is unclear which records she was responsible for. (AR 56.)

[4] A GAF is a numeric score based on a scale (1 through 100) used by mental health clinicians to rate patients' social, occupational, and psychological functioning.

upcoming hearing and, at Corniels's request, he added a prescription for the anxiety medication Buspirone. (AR 659-60.) In March 2009, Corniels also visited Dr. Isaac at the Family Christian Health Center, who gave Corniels a GAF score of 51-60 and noted that Corniels's mood and affect were dysphoric. (AR 679.)

In July 2009, Grand Prairie Services lost state funding and Corniels was forced to fill his prescriptions at Oak Forest Health Center. (AR 57-60, 639-56.) In October 2009, Corniels ran out of medication, had an anxiety attack, and visited the Oak Forest emergency room. (AR 641-44, 665.) Shortly after his emergency room visit, and about a week before the ALJ hearing, Corniels started treatment with Dr. Khattak, a psychiatrist at Oak Forest. (AR 57, 59, 662-70.) After the hearing, Dr. Khattak completed a questionnaire regarding Corniels. (AR 662-70.) She diagnosed Corniels with panic disorder with agoraphobia, and gave him a GAF score of 62. (AR 663.) She noted that Corniels had panic attacks "several times a week," that he would be incapable of tolerating even low-stress work environments, and that he would be absent from work more than three times per month. (AR 665, 669, 670.) Dr. Khattak was "unable to comment" in response to the questionnaire's specific inquiries into Corniels's abilities. (AR 666.) At the time, she had been treating him for less than three weeks. (AR 663, 666-68.)

Dr. Khattak submitted a second questionnaire in 2010, after the ALJ closed the record but before the ALJ issued an opinion. (AR 682-90; dkt. 14 at 15.) She again diagnosed panic disorder with agoraphobia and gave Corniels a GAF score of 55. (AR 683.) She identified a number of symptoms that she had not identified in her previous questionnaire, such as anhedonia and paranoia. (*Compare* AR 664, *with* AR 684.) Dr. Khattak noted that, even though Corniels had not sought hospitalization, he had called a panic hotline three times for his panic attacks. (AR 685.) Unlike her first assessment, she concluded that Corniels would be capable of

3

handling some low stress work environments, but his impairments would keep him from work for more than three days per month. (AR 689-90.)

Although Corniels's case primarily rests on a mental, rather than physical, disability, his physical state nevertheless bears some mention. Corniels is obese, and suffers from both hypertension and arthritis. (AR 416, 639, 663.) In January 2009, Corniels fell and twisted his knee. (AR 647, 672.) He underwent a complete exam at Family Christian Health Center in February 2009, in which he complained of pain in his right knee as well as sleep apnea. (AR 671-76.) Corniels continued to complain of knee pain in follow-up visits. (AR 677-79, 647.)

## II.   Employment History[5]

Corniels completed high school, but he did not attend college or receive vocational training. (AR 46.) He has a drivers' license but does not own a car. (AR 47.) From 1993 to 2000, Corniels maintained electronics assembly machines. (AR 235, 255, 259.) It appears that Corniels was not steadily employed between 2000 and 2003, although he may have done some in-home care. (AR 235.) In 2003 and 2004, Corniels worked as an electronics assembler, but he was laid off after a year because the position was no longer needed. (AR 54-55.) He also was a greeter at a retail store in 2003 or 2004 and had a job as an electronics tester for about seven months in 2004 and 2005. (AR 229.) In 2007, Corniels briefly worked as a part-time greeter at a grocery store, but he left after six weeks because of the stress of interacting with the public. (AR 75-76, 227, 229.) At the hearing, Corniels testified that he "usually ends up getting fired" from jobs because of absenteeism due to his panic attacks and doctors' appointments. (AR 48.) He

---

[5] Corniels's work history report (AR 255), wage records (AR 227, 229), and testimony provide an incomplete and sometimes conflicting picture of his employment history. The court has attempted to piece together the history to the best of its ability.

testified that he had been fired at least ten times since 1985, almost always because of his absenteeism. (AR 97.)

### III. Disability Claim and Hearing Testimony

In 2007, Corniels applied for disability insurance benefits and SSI for the period starting March 20, 2005 (the date he stopped working as an electronics tester). (AR 213.) The Social Security Administration denied his claim on August 30, 2007 (AR 126-32) and denied his request for reconsideration in March 2008 (AR 133-44). Corniels requested review by an ALJ and a hearing was held on November 5, 2009. (AR 40-102, 145-46.) A medical expert, Dr. Kravitz, and a vocational expert, Steven Stover, testified at the hearing. (AR 40.)

#### A. Corniels's Limitations and Activities

Corniels testified that he suffers from panic attacks that last one to three hours and are followed by depression. (AR 50, 63-64.) During an attack, Corniels becomes agitated; his heart races and he sweats, hyperventilates, and becomes emotional.[6] (AR 50, 96-97.) After an attack, Corniels falls into a depression and has difficulty moving and interacting with people. (AR 63-64.) Corniels testified that this depression is occasionally so severe that if a panic attack occurs at night, the depression can prevent him from working the next day. (*Id.*) Corniels testified that the attacks occur about five to ten times a month.[7] (AR 48-50.) They are unpredictable and do not have clear triggers, although stress may exacerbate them. (AR 49, 53-54.) Although the

---

[6] Although the attacks occur both inside and outside the home, Corniels testified that they are worse outside the home and worst when he is alone. (AR 49-53, 61.) For example, he has had severe attacks when driving alone at night. (*Id.*)

[7] While Corniels was employed in 2005, he testified he had two to three panic attacks at work per month and an additional three to four attacks at home per month, which caused him to miss work the following day. (AR 51, 53, 63.)

5

frequency of Corniels's panic attacks has been relatively constant, he testified that they have recently intensified. (AR 56, 64-65.)

Corniels also suffers from agoraphobia and has difficulty being in a space with more than thirty or forty other people. (AR 60, 403, 683.) At times he experiences anxiety about leaving the house. (AR 95-96.) He generally only goes out for doctors' appointments or to get groceries. (AR 90.) His trips to the grocery store are short because he does not like being in a space with many people, and he does not go out for dinner or movies. (AR 61-62.) On a day-to-day basis, Corniels helps his landlord with household chores and caring for his landlord's three dogs. (AR 85.) Otherwise he mostly sleeps. (AR 90.) He does not watch a lot of television because he quickly gets restless and nervous. (AR 86.) He often neglects personal hygiene because he is afraid of entering the bathroom. (AR 93-94.)

**B.    Medical Expert Testimony**

Dr. Kravitz, a clinical psychologist, reviewed the record and completed a medical interrogatory in April 2009. (AR 190, 629-38.) Dr. Kravitz concluded that Corniels suffers from anxiety, depression, and panic disorder with agoraphobia. (AR 630.) He explained that Corniels's impairments result in mild limitations on his daily activities and moderate limitations on his social functioning and ability to maintain concentration, persistence, or pace. (AR 631.) Dr. Kravitz noted that Corniels would be limited to carrying out simple and short instructions that involved only brief and superficial contact with coworkers and incidental contact with the general public. (AR 634.) In addition, he observed that Corniels could not easily handle work environments with variable daily routines, strict production quotas, or unpredictable levels of work-related stress. (AR 634.) Because Dr. Kravitz thought Corniels's reported functional

limitations were more severe than those in his medical records, he found Corniels only partially credible. (AR 635.)

After listening to Corniels's testimony at the ALJ hearing, Dr. Kravitz revised his opinion and found Corniels to be "somewhat more limited" than in his original assessment. (AR 68.) He expanded on two limitations he had set forth in his written assessment—variation in daily work environment and strict production quotas. First, Dr. Kravitz testified that Corniels would need a work environment that was comfortable and familiar. (*Id*.) A job with rotating or multiple supervisors would be "problematic" for Corniels, as would an environment where he did not meet his next supervisor in advance. (AR 70.) Second, Dr. Kravitz testified that Corniels would need a work environment that did not have strict production quotas. (AR 68.) Corniels could be subject to some quotas but not within strict time parameters, as his work would be interrupted by his panic attacks. (AR 68.) Dr. Kravitz suggested that Corniels was only able to work at his previous job, which had production quotas, because of special consideration by his employer. (AR 69.) Without an understanding employer, Dr. Kravitz found that it would be difficult for Corniels to maintain employment in a competitive environment. (*Id.*)

### C. Evidence from the Vocational Expert

The vocational expert, Steven Stover, answered a number of hypothetical questions about Corniels's ability to find work. First, the ALJ asked Stover whether Corniels could perform his past jobs with limitations to simple, routine, and repetitive tasks; a work environment free of fast-paced production requirements with only simple work-related decisions; and with few workplace changes. (AR 77.) Stover answered that Corniels could perform his past jobs as a small parts assembler or as a bagger, but that it would depend on whether the specific position was "free [of] fast pace" production requirements. (AR 78.) Stover noted that Corniels's prior

7

employment was due to special consideration by his employer, and while such positions exist, he declined to speculate as to how common they were. (AR 79-80.) The ALJ added a limitation to only occasional contact with the public to her hypothetical, and Stover responded that the small parts assembly job was possible with that limitation. (AR 80.) The ALJ then asked Stover to only include jobs that had few changes in supervisors and coworkers. (*Id.*) Stover responded that change occurred on a fairly consistent basis in unskilled employment and declined to opine on the number of available jobs consistent with such a limitation. (AR 80-81.)

The ALJ then asked what other work was available consistent with limitation to simple, routine, and repetitive tasks; a work environment free of fast-paced production requirements with only simple work-related decisions; and with few workplace changes. (AR 81.) Stover testified that a person with such limitations would be able to perform the unskilled work of a laundry worker, packager, or porter. (*Id.*) Adding a restriction on interaction with the public would eliminate the porter position. (AR 81-82.) An additional limitation requiring only occasional interaction with coworkers would not affect either the laundry worker or packager positions. (AR 82-83.) But Stover testified that in his experience few of these unskilled jobs are consistent with a limitation to little change in supervisors or coworkers. (AR 83.) He repeated that, in unskilled work environment, "there is rather constant personnel change." (*Id.*)

Corniels's counsel then asked Stover whether someone with the limitations described by the ALJ could work competitively if he missed two days of work per month on average. (*Id*.) Stover testified that such a person would not be able to work competitively. (*Id.*) Corniels's counsel also asked whether competitive employment was possible if a person took unscheduled breaks for one to three hours at a time, a couple times per week. (AR 84.) Stover testified that such a person would not be able to work competitively. (*Id.*)

8

### D. Denial of Claim

The ALJ issued an opinion denying Corniels's claim for benefits on August 5, 2010. (*See* AR 20-31.) Corniels requested review of the ALJ's decision and the Appeals Council denied review in April 2011, making the ALJ's decision the final decision of the Commissioner. (AR 1-3, 15.)

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013) (citing 42 U.S.C. § 405(g)); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)).[8] "Substantial evidence" has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [it] must uphold the decision under review." *Shideler* v. *Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's decision, however, must rest on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler*, 688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand

---

[8]  The Act provides, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

9

is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## ANALYSIS

**I.      Legal Framework**

To determine whether a claimant is disabled and thus eligible for either disability insurance benefits or SSI, an ALJ uses a sequential five-step inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If so, the claimant is not eligible for benefits. *See id.* At step two, the ALJ assesses whether the claimant has an impairment or combination of impairments that are severe. *See id.* At step three, the ALJ determines whether the impairment(s) meet or equal a listed impairment in the Social Security regulations and thus preclude substantial gainful activity. *See id.*; 20 C.F.R. pt. 404, subpt. P, app. 1. At step four, the ALJ analyzes the claimant's residual functioning capacity ("RFC") to determine whether the claimant can perform his past relevant work. *See* 20 C.F.R. §§ 404.1520, 416.920. Finally, at step five, the ALJ determines whether the claimant can perform other work considering the claimant's RFC, age, education, and experience. *See id*. "The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step." *Young* v. *Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

**II.     ALJ Decision**

The ALJ found that Corniels was not engaged in substantial gainful activity and suffered from several severe impairments—panic disorder with agoraphobia, depressive disorder, anxiety disorder, and obesity. (AR 22.) She determined that the impairments did not meet or equal an impairment listed in the Social Security regulations, and thus moved on to assess Corniels's RFC. (AR 23-24.) The ALJ determined that Corniels could perform work that is limited to simple, repetitive, and routine tasks; is free of fast-paced production requirements; involves simple work-related decisions; has few, if any, workplace changes; and requires only occasional interactions with the general public, coworkers, and supervisors. (AR 25.) At step four, the ALJ concluded that Corniels could perform his past work as a small parts assembler and, alternatively at step five, she concluded that Corniels he could perform other jobs including those of laundry worker and packager. (AR 29-30.)

**III.    Whether ALJ's RFC Determination Was Flawed**

An RFC represents the maximum a claimant can perform on a "regular and continuing basis" despite his limitations. Social Security Ruling 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996); *see also Casanova* v. *Colvin*, No. 13 C 0676, 2014 WL 3793249, at *5 (N.D. Ill. July 30, 2014). "In making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, 'even [limitations] that are not severe, and may not dismiss a line of evidence contrary to the ruling.'" *Murphy* v. *Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (quoting *Villano* v. *Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)) (alteration in original). The ALJ need not, however, address each piece of evidence. *Murphy*, 759 F.3d at 817-18 (citations omitted).

Corniels argues that the ALJ's RFC assessment was flawed because she did not properly incorporate two limitations proffered by Dr. Kravitz at the hearing, despite giving his testimony

great weight. (*See* AR 23.) These limitations are: (1) consistent and predictable supervisors; and (2) no strict production requirements.[9]

### A. Consistent and Predictable Supervisors

Based on Corniels's testimony at the hearing, Dr. Kravitz testified that, in addition to the limitation in his written report, he would add a limitation to "a comfortable familiar setting with individuals that claimant was comfortable with." (AR 69.) He explained,

> [I]f it was a work environment where they rotated supervisors or different supervisors came in to supervise you for different projects, that would probably be more problematic for the claimant, and if you didn't know in advance who would be your supervisor or you knew that this was your supervisor for the next two months, but they you didn't know who the next supervisor was going to be—I mean, those sorts of changes, I think would be difficult for the claimant.

(AR 70.) Corniels argues that the ALJ's opinion is inadequate because it fails to specifically discuss this "consistent and predictable supervisor" limitation proposed by Dr. Kravitz, which Corniels contends is different than the "few workplace changes" limitation ultimately adopted by the ALJ.

Although an ALJ is free to disregard a proffered limitation, she must provide a legitimate reason for her decision. *See, e.g.*, *Lopez ex rel. Lopez* v. *Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003) (remanding where ALJ failed to discuss reason for rejecting a limitation). The ALJ may not ignore a line of questioning or facts that is inconsistent with her opinion. *Golembiewski* v. *Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citing *Zurawski* v. *Halter*, 245 F.3d 881, 888 (7th Cir. 2001)). "Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision

---

[9] Corniels argues that the ALJ also failed to implement an "understanding employer" restriction, citing Dr. Kravitz's testimony that unless someone who misses work due to panic attacks like Corniels has "an employer who is very understanding or so wowed by your work that they're willing to allow those things to occur, well then I think it would be difficult to maintain competitive employment." (AR 69.) Corniels errs in interpreting this statement as an additional medical restriction. Dr. Kravitz made the comment in response to a question by the ALJ about how Corniels was able to hold down his last job.

12

rests upon substantial evidence." *Golembiewski*, 322 F.3d at 917 (citing *Smith* v. *Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)).

In this case, the ALJ credited Dr. Kravitz's testimony and explicitly stated that the limitations she determined in Corniels's RFC accommodated Dr. Kravitz's recommendation. (AR 25.) But she never mentioned the discussion at the hearing about Dr. Kravitz's limitation to jobs with consistent and predictable supervisors. It is clear from the hearing testimony that such a restriction would have a significant effect on the number of jobs available to Corniels. For example, when the ALJ asked the vocational expert whether jobs similar to Corniels's past jobs could accommodate a limitation to consistent and predictable supervisors, the vocational expert responded that he could not testify to the percentage of unskilled jobs that could accommodate this limitation. (AR 80-81.) When the ALJ asked a similar question with respect to other jobs, such as laundry worker or packager, the vocational expert again responded, "I believe in an unskilled work environment that there is rather constant personnel change. People come and go." (AR 82-83.)

Because the ALJ ignored the testimony of a witness she found credible regarding a limitation to consistent and predictable supervisors and failed to discuss her reasons for rejecting the limitation, a remand is required to allow the ALJ to determine whether the limitation would reduce Corniels's RFC.[10]

---

[10] The Commissioner argues that "even if the ALJ's specific restrictions did not fully take into account [the familiar work environment] limitation, the ALJ's ultimate conclusion—that Corniels could return to his past relevant work as a small parts assembler—was consistent with that limitation." (Dkt. 23 at 5.) But as the Seventh Circuit has observed, "[o]ne can be unemployable, yet employed," if employed by an altruistic employer. *Wilder* v. *Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (citations omitted); *see also Smith* v. *Barnhart*, 388 F.3d 251, 253 (7th Cir. 2004) ("The issue is not whether the applicant for benefits can return to the precise job he held, which is hardly likely to have been kept open for him, but whether he can return to a 'job' he held that exists at other employers.") Although Corniels may have been able to continue to function at his prior job, it is not clear that he could do the same type of work for a different employer. (AR 69.)

### B. Production Requirements

Dr. Kravitz opined in his pre-hearing report that Corniels would have difficulty handling strict production quotas. (AR 634.) After hearing Corniels's testimony, Dr. Kravitz elaborated on this restriction: "[T]here could be an expectation of work produced, but not within strict time parameters . . . because if claimant was having one or two panic attacks that day, certainly his work wouldn't be what others would accomplish." (AR 68.) In her RFC determination, the ALJ translated this limitation to require a job "free of fast-paced production requirements." (AR 25.) She noted that she "did not restrict the claimant from all production quotas or requirements." (AR 29.) The parties dispute whether the ALJ's modified production requirement properly includes the limitation suggested by Dr. Kravitz.

Although there is a distinction between the "strict production requirement" suggested by Dr. Kravitz and "fast-paced production requirement" adopted by the ALJ, in this instance the ALJ sufficiently supported her decision to reject Dr. Kravitz's recommendation. The ALJ explicitly found that Corniels's testimony about his absenteeism was not credible because it was not supported by the record. (AR 27.) She noted that the medical records indicated that Corniels's panic attacks were less frequent and severe than Corniels reported at the hearing.[11] (*Id.*) The ALJ agreed with Dr. Kravitz that Corniels should not have "fast-paced" production requirements but thought he was capable of fulfilling some types of production requirements—such as those imposed in his last job as a small parts assembler, or those imposed on laundry workers or packagers. This is sufficient to support her finding that Corniels did not need to be free of all production requirements.

---

[11] Corniels separately argues that the ALJ failed to make a specific finding about the frequency of his panic attacks. But the court finds that the ALJ adequately supported her determination that Corniels testimony about the severity of his symptoms was not credible without specifically determining their frequency.

## III. Other Arguments

Corniels also argues that the ALJ did not properly credit Dr. Khattak's opinion and the ALJ did not properly consider Corniels's obesity. Because the court is remanding the case for further proceedings in accordance with this opinion, it will address these arguments only briefly.

First, the ALJ's decision to give little weight to Dr. Khattak's opinion was adequately supported. Dr. Khattak's opinion only represented one month of interaction between Dr. Khattak and Corniels, and the ALJ observed that Dr. Khattak's findings were internally inconsistent and she did not identify tests in support of her diagnosis. (AR 28.) On remand, however, there may be additional information from Dr. Khattak that could alter the weight given to her opinion. For example, Dr. Khattak submitted a more complete medical opinion in 2010, representing seven months of treatment, which may alleviate the ALJ's concerns.[12] (AR 682-90.)

Second, at step two the ALJ included obesity as one of Corniels's severe impairments, which requires that "it significantly limit the individual's physical or mental ability to perform one or more basic work activities needed to do most jobs." POMS, DI 22001.015, Severe / Non-Severe Impairment(s); *see also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). But in determining Corniels's RFC, the ALJ concluded that there were no restrictions resulting from Corniels's obesity because he did not complain of any limitations due to his weight and he could "ambulate effectively without any problems." (AR 29.) This finding contradicts a finding that Corniels's obesity was a severe impairment. Although it is possible that the error was harmless as the jobs discussed by the ALJ did not require physical exertion beyond Corniels's capability, because the court is remanding on other grounds, the court

---

[12] The parties dispute whether the ALJ reviewed this 2010 opinion before issuing her opinion, and the record is unclear as to whether she did.

15

also directs the Commissioner consider any physical limitations resulting from Corniels's obesity.

**CONCLUSION**

For the foregoing reasons, Corniels's motion for summary judgment (dkt. 13) is granted. The decision of the Commissioner is reversed. The case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for rehearing as set out in the above Opinion.

Date: October 24, 2014     _____
U.S. District Judge Joan H. Lefkow